[Cite as *State v. Davison*, 2021-Ohio-728.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28579 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1560 |
| | : | |
| JAMES A. DAVISON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of March, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 426 Patterson Boulevard, Dayton, Ohio 45419
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

**{¶ 1}** James A. Davison appeals from his conviction following a jury trial on charges of aggravated murder, murder, evidence tampering, improper handling of a firearm in a motor vehicle, and various specifications.[1]  The State has also filed a cross-appeal.

**{¶ 2}** Davison advances three assignments of error. First, he contends the trial court erred in failing to apply the exclusionary rule to preclude the State from introducing evidence of warrantless cell phone "ping" data. He argues that the trial court failed to address whether the good-faith exception to the exclusionary rule applied and that the State failed to demonstrate exigent circumstances to justify dispensing with a warrant. Second, Davison asserts that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court overruled his objection at trial to the State's introduction of the cell phone data that was obtained without a warrant. Third, he claims his conviction for aggravated murder based on "prior calculation and design" was based on legally insufficient evidence and/or was against the manifest weight of the evidence.

**{¶ 3}** The State's cross-appeal raises two assignments of error. First, it challenges the trial court's merger of the offense of discharging a firearm on or near a prohibited premises into the aggravated-murder for purposes of sentencing. Second, it contends the trial court erred in merging multiple three-year firearm specifications and sentencing Davison on only a single, three-year firearm specification.

---

[1] A jury also found Davison guilty on two counts of felonious assault and one count of discharging a firearm on or near a prohibited premises. The trial court merged the felonious assaults into aggravated murder and murder as allied offenses of similar import. The trial court likewise merged discharging a firearm on or near a prohibited premises into aggravated murder.

{¶ 4} The charges against Davison stemmed from the shooting deaths of two victims, Darion Harris and Ashley James, outside a Dayton-area nightclub in the early morning hours of April 21, 2018. The State's evidence at trial established that the victims attended the nightclub with Harris' brother and sister. They all arrived in a truck driven by Harris. Davison also was at the nightclub that evening. At some point, he exited the club and sat in his red Dodge Durango, which was parked near the entrance. Minutes later, the victims' group came out and began walking toward Harris' truck. Just as Harris and his three companions closed the truck's doors, Davison pulled up to the driver's side in his red Durango, fired numerous shots into Harris' vehicle, and sped away. On a surveillance video, broken glass can be seen flying from Harris' truck windows as bystanders flee. Harris and James were dead when police and medics arrived. Harris' brother and sister were unharmed.

{¶ 5} Shortly after the shooting, detectives obtained the surveillance video, which they enhanced to help identify Davison as the person driving the red Durango. An informant provided police with Davison's cell phone number. Upon obtaining the number, investigators contacted his cell-phone service provider, Sprint, and obtained assistance tracking his phone by way of real-time cell-site location "pinging." Investigators also promptly obtained a search warrant to track Davison's cell phone "ping" data. Although some tracking occurred before investigators obtained the warrant, police had the warrant when they tracked Davison's cell phone north to Sandusky, where he left his red Durango parked in front of his father's house. Davison then drove another vehicle back to Dayton as investigators tracked his cell phone, which eventually led them to his girlfriend's mother's house, where he was arrested.

{¶ 6} During a post-arrest interview, Davison admitted attending the nightclub at the time in question and driving the red Durango seen in the surveillance video pulling up to Harris' truck. When questioned further about the incident during his interview, Davison did not answer. During their investigation, police discovered a potential motive for the shooting. Investigators learned that days before the shooting Davison discovered that Harris had sold him a house that Harris did not own.

{¶ 7} Based on the evidence presented, a jury found Davison guilty on all counts. After merging several offenses and specifications, the trial court imposed an aggregate sentence of 48 years to life in prison. This appeal and cross-appeal followed.

{¶ 8} In his first assignment of error, Davison challenges the cell phone "ping" tracking that occurred before police secured a warrant to obtain the information. Davison asserts that the warrantless tracking violated the Fourth Amendment, that the trial court failed to make a finding regarding the applicability of the good-faith exception to the exclusionary rule, and that the State failed to establish exigent circumstances to justify circumventing the need for a warrant. Likewise, in his second assignment of error, Davison contends the trial court erred in overruling his objection to the State's introduction of testimony at trial about the warrantless "ping" tracking. In support of both assignments of error, Davison relies on *Carpenter v. United States*, __ U.S. __, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018).

{¶ 9} Upon review, we find Davison's first two assignments of error to be without merit. In *Carpenter*, the U.S. Supreme Court held that the government's acquisition of historical cell phone location records spanning a period of 127 days constituted a Fourth Amendment search for which a warrant was required. The *Carpenter* court also

recognized, however, that "case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances." *Id.* at 2222. In particular, the exigencies of a situation may justify dispensing with a warrant before accessing cell phone location records when there is a "need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Id.* at 2223.

{¶ 10} In *State v. Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112 (2d Dist.), we found *Carpenter* applicable to law enforcement's request for a service provider to "ping" the defendant's cell phone twice over two days. *Id.* at ¶ 33. We also found that *Carpenter* had retroactive applicability to the defendant's case, which remained pending when *Carpenter* was decided. *Id.* at ¶ 30-31. Nevertheless, we held that the warrantless pinging was permissible because exigent circumstances existed—namely the armed defendant had shot the victim and fled the scene. *Id.* at ¶ 37. We also found the good-faith exception to the exclusionary rule applicable because when police pinged the defendant's cell phone without a warrant, such "conduct was lawful under both federal and state law in this jurisdiction" *Id.* at ¶ 38, *Carpenter* had not yet been decided, and existing precedent held that a warrant was not required to obtain cell phone ping data because individuals had no reasonable expectation of privacy in such information. *Id.* at ¶ 38-41.

{¶ 11} In the present case, the shooting occurred at approximately 3:34 a.m. on April 21, 2018. (Trial Tr. at 175, 676.) Later that morning, police learned Davison's identify after reviewing a surveillance video, and they obtained his cell phone number. (*Id.* at 607-610.) After determining that Sprint was Davison's cell-phone carrier, police contacted Sprint and requested real-time "exigent circumstances ping[ing]" of his phone as well as

48 hours of historical call details. (*Id.* at 610-611.) The initial information police received from this pinging provided only a "general area" where the phone was located. It was not specific enough to find Davison. (*Id.* at 615.)

{¶ 12} That same morning, detective Brad Daugherty began preparing a search-warrant application to track Davison's cell phone. (*Id.* at 380-381.) After Daugherty obtained the warrant later that day, police still could not pinpoint Davison's location because the ping radius was too large. (*Id.* at 382.) On the night of April 21, 2018 into the morning of April 22, 2018, however, police tracked the phone leaving Dayton and traveling to Sandusky. (*Id.*) Investigators located an address for Davison's father in Sandusky, and the red Durango was observed parked in front of Davison's father's house on the morning of April 22, 2018. (*Id.* at 382-383.) The red Durango remained parked in Sandusky while Davison's cell phone was tracked back to Dayton on April 23, 2018. (*Id.* at 384.) Police tracked the phone to Davison's girlfriend's mother's house, where they found him and arrested him. (*Id.* at 385-386.)

{¶ 13} On the record before us, we are unpersuaded that the trial court erred in allowing testimony about the warrantless tracking of Davison's cell phone. We reach this conclusion for at least three reasons. First, Davison never filed a motion to suppress related to the warrantless tracking. On appeal, he claims no suppression motion was filed because the State did not disclose the warrantless tracking before trial. The record reflects, however, that the warrantless tracking was addressed in a police report that was part of discovery. It stated that "exigent circumstance information and phone pings" had been requested from Sprint while detective Daugherty prepared a search-warrant application. (*Id.* at 629.) Under Crim.R. 12(C), a request to suppress evidence on the

basis that it was illegally obtained must be made through a pretrial motion. By failing to file a pretrial suppression motion raising the issue, Davison has waived all but plain error.

{¶ 14} Second, we have no trouble concluding that exigent circumstances justified initially dispensing with a warrant and pinging Davison's cell phone as soon as his name and phone number were obtained. As the U.S. Supreme Court recognized in *Carpenter*, the need to pursue a fleeing suspect can constitute an exigent circumstance sufficient to overcome the warrant requirement. That was true in *Snowden*, where this court found exigent circumstances to allow warrantless pinging after an armed defendant shot the victim and fled the scene. We reach the same conclusion in the present case, which involved an armed Davison fleeing the scene in his red Durango after shooting and killing two people. The trial court did not err in finding exigent circumstances when Davison objected at trial to the warrantless pinging of his cell phone. (Trial Tr. at 613-614.)

{¶ 15} Third, we have no doubt that the good-faith exception to the exclusionary rule applies. When police obtained Davison's cell-site location information, the U.S. Supreme Court had not yet decided *Carpenter*. At that time, the law in this jurisdiction permitted warrantless pinging of a suspect's cell phone. *See*, *e.g.*, *State v. Taylor*, 2d Dist. Montgomery No. 25764, 2014-Ohio-2550, ¶ 7 (finding no reasonable expectation of privacy in the pings emitted from a suspect's cell phone); *United States v. Carpenter*, 819 F.3d 880, 888 (6th Cir.). Evidence obtained in reasonable reliance on binding precedent is not subject to suppression under the exclusionary rule. *Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112, at ¶ 39, quoting *Davis v. United States*, 564 U.S. 229, 241, 131 S.Ct. 241, 180 L.Ed.2d 285 (2011).

{¶ 16} For each of the foregoing reasons, we see no error in the trial court's

allowing testimony about the pinging of Davison's cell phone that occurred for a period of time before police obtained a warrant. Davison's first and second assignments of error are overruled.

{¶ 17} In his third assignment of error, Davison contends the State failed to prove that he acted with prior calculation and design when he shot and killed Darion Harris. His assignment alleges that there was "no evidence" presented at trial to establish prior calculation and design. We are unsure whether Davison is challenging the legal sufficiency or manifest weight of the evidence. He argues in the body of his brief that the jury "clearly lost its way," which suggests a manifest-weight challenge. Regardless, we conclude that the jury's prior-calculation-and-design finding was supported by legally sufficient evidence and was not against the weight of the evidence.

{¶ 18} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 19} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an

appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 20} Here Davison contends the State presented no evidence that he had known the victims would be at the nightclub. He further argues the absence of evidence that he had encountered the victims inside the nightclub. Davison additionally asserts that there was no evidence he had "had a gun on his person" or that he had retrieved a gun from the back of his Durango just before the shooting. He also argues that the large number of shots fired in rapid succession militated against a finding of prior calculation and design. For these reasons, he argues that the shooting just as likely could have been the result of his "sudden impulse or rage" upon unexpectedly seeing Harris, who recently had defrauded him on a home purchase.

{¶ 21} Upon review, we conclude that the State presented legally sufficient evidence to prove prior calculation and design and that the jury's finding on the issue was not against the weight of the evidence. The phrase "prior calculation and design" suggests " 'an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim.' " *State v. Walker*, 150 Ohio St. 3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17, quoting Ohio Legislative Service Commission,

*Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures*, at 71 (1971). "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of 'prior calculation and design.' In this context, *momentary deliberation is considered insufficient* to constitute a studied scheme to kill." *Id.*

{¶ 22} In *Walker*, the Ohio Supreme Court elaborated on what is required to establish prior calculation and design:

> The phrase "prior calculation and design" by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death. The General Assembly has determined that it is a greater offense to premeditate or to plan ahead to purposely kill someone. All prior-calculation-and-design offenses will necessarily include purposeful homicides; not all purposeful homicides have an element of prior calculation and design.

> Since the enactment of R.C. 2903.01 in 1974, we have repeatedly emphasized that there is no "bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." [Citations omitted.]

> We traditionally consider three factors in determining whether a

defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " [Citations omitted.]

*Id.* at ¶ 18-20.

{¶ 23} In the present case, Davison entered the nightclub at approximately 2:53 a.m. He later exited the nightclub ahead of the victims. He went to his Durango and waited inside it for approximately two minutes. A surveillance video outside the nightclub established that at some point there was no traffic blocking Davison and nothing prevented him from driving away if he desired. Instead, Davison waited inside his truck until the victims exited the nightclub. After the victims walked past Davison's truck, he exited his vehicle and retrieved something from the back seat before returning to the driver's seat. Then, as the victims were entering their own vehicle and closing their doors, Davison pulled alongside them and fired numerous shots before speeding away.

{¶ 24} In its closing argument, the State addressed the issue of premeditation as follows:

So how do we know this was premeditated? Well, there is no evidence that these folks saw each other inside the bar, no altercations. We heard from Brandon and, you know, there's nothing inside the bar that indicates they even knew each other was there.

What we do know is that when folks were leaving and the victims were leaving with their food, there sits the defendant in that red Dodge

Durango and he's waiting. And the video, again, shows he's parked out front. He literally—you can see the victims walk right by his car, right by his car. And what does he do? He waits. Mind you, there's some cars in front of him initially but, ultimately, those cars go away. He could've easily taken off and gone home. But what does he do? He decides to wait. And not only does he decide to wait. He decides to physically get out of his car, opens the back door of his car, gets into the back seat area and retrieves an item. Now, I'm not going to mince words and I'm not going to sugarcoat this—we believe he's getting the gun. That's what he's getting. You can use your common sense to figure that out. You're allowed to connect the dots.

Even though the video—and try as we did to zoom in, it's just blurry but you can see there's something in his hand. And how do we know? How can we connect more dots to make that logical inference? Well, we know when he went into the bar, he was patted down. Right? We saw that on the video. And you would think, if it was a good pat down, that if he had a gun at that point they would've taken it from him.

So we logically can infer he didn't have a gun when he went in. So it makes sense now that he has seen Darion, who he knows—and we'll talk about that later—he gets out and he retrieves that gun. That's what he's doing when he gets out.

Then he gets back in. And what does he do then? He waits. And as he starts creeping—and you can watch the car, it starts creeping forward—there's still time elapsing. He still has time to make a decision. He's making

his own conscious decisions to do what he wants to do. And then what does he do, as we all know, he pulls right up next to that car, driver's side to driver's side, and he unloads. He was going to make darn sure that Darion Harris was going to die—17 rounds at least, 21 rounds, you pick. He was going to kill him.

That, ladies and gentlemen, is premeditation. He made conscious decisions. He waited. He made the gun available. He had to make distinct movements to get the gun. That is more than sufficient time, under the law, to constitute premeditation and prior calculation.

So I submit to you, again for your own eyes, this was not spur of the moment. He waited for the opportunity to get his revenge.

(*Id*. at 734-735.)

{¶ 25} In our view, the jury reasonably could have found that Davison's act of shooting Harris was more than an act committed on the spur or the moment or after momentary consideration. Davison exited the nightclub before the victims and waited in his Durango when he simply could have pulled away and left. At some point, he also retrieved from the back of his vehicle what the jury reasonably could have determined was the handgun used in the shooting. But regardless of whether Davison already had the handgun on his person or retrieved it from the back of his vehicle, he waited in front of the nightclub as the victims passed him and made their way to their own truck. As they closed their doors, Davison then slowly pulled alongside them and opened fire.

{¶ 26} Applying the three factors the Ohio Supreme Court identified in *Walker*, 150 Ohio St. 3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, we believe the jury reasonably could

have found prior calculation and design in the killing of Darion Harris. First, the record reflects that Davison and Harris did know each other, and their relationship fairly could be characterized as strained. As set forth above, the State's evidence established that days before the shooting Harris fraudulently had sold Davison a house that Harris did not own. Second, the jury reasonably could have found that Davison gave some prior thought to the murder site and possibly the murder weapon. The fact that Davison gave prior thought to the murder location can be inferred from the fact that he waited outside for the victims before shooting Harris. The jury also could have found that he gave prior thought to the murder weapon if it accepted the State's circumstantial evidence that what Davison retrieved from the back of his Durango was the handgun he used to shoot Harris. Third, given that Davison sat and waited for his victims to leave the nightclub and enter their vehicle before pulling alongside them and firing, the jury reasonably could have found that his act of killing Harris was sufficiently drawn out rather than an almost instantaneous eruption of events.

{¶ 27} Having reviewed the record, we believe the State presented legally sufficient evidence to support a finding of prior calculation and design. Such a finding by the jury also was not against the manifest weight of the evidence. Accordingly, Davison's third assignment of error is overruled.

{¶ 28} In its first assignment of error on cross-appeal, the State challenges the trial court's merger of Davison's conviction for discharging a firearm on or near a prohibited premises with his aggravated-murder conviction. The State objected to the merger below. It argues on appeal that merger was not appropriate because the two offenses had a dissimilar import or significance.

{¶ 29} We review the trial court's merger ruling de novo. *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 10. " 'As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

{¶ 30} In the present case, the trial court reasoned as follows when merging Davison's conviction for discharging a firearm on or near a prohibited premises into his aggravated-murder conviction:

> Under the just very unique circumstances of how this transpired of the shooting being from the vehicle on the roadway but in very close proximity to the truck containing the decedents and so it all happened in just one sort of massive simultaneous incident and it seems to me with— basically the test for merger is met in that circumstance.

(Trial Tr. at 837.)

{¶ 31} The trial court's reasoning supports a finding that the aggravated murder and the discharging-a-firearm offenses were not committed separately and were not committed with a separate animus. We agree with this determination. The record reflects that Davison fired multiple shots in rapid succession with the singular motivation of killing

Darion Harris. In our view, however, the trial court's finding that the two vehicles were in close proximity and that Davison's offenses occurred as part of "one sort of massive simultaneous incident" failed to address the first question above, namely whether the offenses were of dissimilar import or significance.

{¶ 32} In *State v. Williams*, 2d Montgomery No. 27663, 2018-Ohio-1647, we recognized that offenses may be of dissimilar import or significance when they involve different victims, when they are not alike in their resulting harm, or when a defendant's conduct places more than one person at risk. *Williams* addressed whether merger was required for the offenses of murder and discharging a firearm on or near a prohibited premises. The defendant in that case fired multiple shots across a roadway in rapid succession, striking and killing the victim. Upon review, we found that the offenses were not subject to merger, reasoning:

> Williams was convicted and sentenced on one count of murder for causing Terion Dixon's death as a proximate result of committing felonious assault. He also was convicted and sentenced on one count of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), which provides: "No person shall do any of the following: * * * Discharge a firearm upon or over a public road or highway." Notably, "[t]he victim of the offense of discharging a firearm upon or over a public road or highway is the public. This is because it is the act itself that is prohibited. The offense can be completed with no one remotely near the location where the firearm is discharged upon or over the public road or highway. R.C. 2923.162(A)(3) is a statute intended to benefit the public good[.]" *State v. James*, 2015-

Ohio-4987, 53 N.E.3d 770 (8th Dist.), ¶ 33; *see also State v. Carzelle*, 8th Dist. Cuyahoga No. 105425, 2018-Ohio-92 (applying *James*). Although Williams actually shot and killed Dixon, his act of firing a handgun across the roadway itself violated the statute, placed numerous people at risk, and harmed the public at large. [Footnote omitted.] Conversely, his murder conviction required harm to a particular victim and differed in the significance and the nature of the harm it addressed.

*Id.* at ¶ 24.

{¶ 33} As in the present case, we acknowledged in *Williams* that the defendant's act of shooting the victim "elevated the degree of the offense of discharging a firearm on or near prohibited premises to a first-degree felony." *Id.* at ¶ 24, fn. 4. We nevertheless found merger not required because "the act of discharging a firearm over a public road or highway itself constituted a violation of the statute." *Id.* This court has followed *Williams* on several occasions, finding that discharging a firearm on or near a prohibited premises does not merge with murder or other offenses because the offenses are of dissimilar import or significance. *State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920; *In re T.P.-A.*, 2d Dist. Montgomery No. 28196, 2019-Ohio-2038, ¶ 17-18; *State v. Ropp*, 2d Dist. Champaign No. 2018-CA-44, 2020-Ohio-824, ¶ 26; *see also State v. Johnson*, 10th Dist. Franklin No. 18AP-889, 2019-Ohio-4265, ¶ 19 ("Though we are mindful that [the defendant's] act of shooting [the victim] elevated the degree of the offense of discharging a firearm on or near a prohibited premises to a first-degree felony pursuant to R.C. 2923.162(C)(4), we nonetheless still find the offense of discharge of a firearm on or near prohibited premises, under these specific facts, to cause separate and

distinct harm to the public."). We recognize that *Williams* and some of the other cases cited above involved plain-error review of a trial court's failure to merge the offense of discharging a firearm on or near a prohibited premises with another offense. Although the procedural posture of Davison's case is different, insofar as the State objected below and now challenges the trial court's decision to apply merger, we find the substantive analysis in *Williams* and the other cases equally applicable here.

**{¶ 34}** We accept, arguendo, that Davison committed a single act with a single animus when he fired multiple shots into Darion Harris' truck. Based on the case law set forth above, however, we conclude that his offenses of aggravated murder and discharging a firearm on or near a prohibited premises were of dissimilar import or significance. The two offenses involved separate victims, as Davison's act of firing on the roadway harmed the public at large and placed numerous people at risk. Accordingly, the trial court erred in merging the offense of discharging a firearm on or near a prohibited premises into Davison's aggravated-murder conviction.[2] The State's first assignment of

---

[2] On remand, the trial court and the parties may wish to consider whether Davison's conviction for discharging a firearm on or near a prohibited premises is subject to merging with his conviction for improper handling of a firearm in a motor vehicle. This issue does not appear to have been addressed below, and the parties do not discuss it on appeal. In *Ropp*, we held that improper handling of a firearm in a motor vehicle (transport of a loaded weapon) *did not* merge with discharging a firearm on or near a prohibited premises (shooting over a public road). *Ropp* at ¶ 23. We concluded that the conduct and animus of having a loaded weapon in a vehicle was dissimilar and separate and from the conduct of subsequently shooting the weapon across a road. *Id.* Notably, however, the trial court in *Ropp* already had merged convictions for improper handling of a firearm in a motor vehicle (discharging a firearm in a motor vehicle) and discharging a firearm on or near a prohibited premises (shooting over a public road) where the shooting occurred in the vehicle. *Id.* at ¶ 10. We express no opinion as to whether the same result is appropriate here, as neither party has raised the issue on appeal. For present purposes, we hold only that the trial court erred in merging Davison's conviction for discharging a firearm on or near a prohibited premises into his aggravated-murder conviction.

error is sustained.

{¶ 35} In its second assignment of error, the State contends the trial court erred in sentencing Davison on only one three-year firearm specification. Although under R.C. 2929.14(B)(1)(b) a trial court ordinarily may impose only one additional prison term for three-year firearm specifications attendant to felonies committed as part of the same act or transaction, the State contends an exception applies. In particular, the State claims R.C. 2929.14(B)(1)(g) obligated the trial court to impose two separate prison sentences for three-year firearm specifications accompanying Davison's aggravated murder and murder convictions.

{¶ 36} In response, Davison maintains that the trial court did not err in merging multiple three-year firearm specifications into one. With regard to the exception referenced by the State, Davison insists that the trial court complied with it. Davison notes that he was convicted of multiple three-year firearm specifications and multiple five-year firearm specifications. The trial court merged all of the three-year specifications into one. It then merged all of the five-year specifications into one. Finally, the trial court imposed one three-year sentence and one five-year sentence to be served consecutively. Because the trial court in fact sentenced him on two firearm specifications (a three-year one and a five-year one), Davison claims the trial court complied with the exception in R.C. 2929.14(B)(1)(g) authorizing separate sentencing on two or more specifications.

{¶ 37} Upon review, we conclude that the trial court's merger of the multiple three-year firearm specifications into one was contrary to law, as it violated R.C. 2929.14(B)(1)(g). Davison's argument is at odds with our opinion in *State v. Howard*, 2020-Ohio-3819, 156 N.E.3d 433 (2d Dist.), which is cited in the State's appellate brief.

In his argument, Davison does not address *Howard*, which we believe is directly on point and dispositive.

{¶ 38} Under R.C. 2941.145, Davison was found guilty of multiple three-year firearm specifications for having a firearm on or about his person while committing his offenses and displaying, brandishing, indicating that he possessed, or using it to facilitate the offenses. Davison also was found guilty of multiple five-year firearm specifications under R.C. 2941.146 for purposely or knowingly causing or attempting to cause the death of or physical harm to another by discharging a firearm from a motor vehicle.

{¶ 39} In *Howard*, we recognized that when a defendant is found guilty of a three-year and a five-year firearm specification accompanying the same offense, a trial court is required to impose both a three-year prison term and a five-year prison term. *Howard* at ¶ 96-97. The trial court correctly did so in the present case. The issue raised by the State's appeal is whether the trial court should have merged the multiple three-year firearm specifications into one. *Howard* answers that question in the negative.

{¶ 40} Although a trial court ordinarily may impose only one additional three-year prison term for multiple firearm specifications committed as part of the same act or transaction (see R.C. 2929.14(B)(1)(b)), an exception is created by R.C. 2929.14(B)(1)(g), which provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in

connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 41} Here Davison was convicted of, among other things, aggravated murder and murder, and he was convicted of three-year firearm specifications of the type described under R.C. 2929.14(B)(1)(a) in connection with both of those felonies. Therefore, the trial court was required to impose the three-year prison term specified under R.C. 2929.14(B)(1)(a) "for each of the two most serious specifications" of which Davison was convicted. In short, R.C. 2929.14(B)(1)(a) obligated the trial court to impose separate prison terms for the three-year firearm specifications accompanying Davison's aggravated murder and murder convictions.

{¶ 42} The foregoing sentencing obligation was not satisfied by merging the three-year firearm specifications into one, merging the five-year firearm specifications into one, and imposing a three-year prison sentence and a five-year prison sentence. *Howard* at ¶ 94. This is so because R.C. 2929.14(B)(1)(g)'s requirements apply to convictions for firearm specifications under R.C. 2929.145, which includes Davison's three-year firearm specifications. It does not apply to convictions for five-year firearm specifications under R.C. 2929.146.[3] *Id.*

---

[3] In fact, unlike R.C. 2929.14(B)(1)(g), which creates an exception permitting sentencing on multiple three-year firearm specifications, another provision, R.C. 2929.14(B)(1)(c), explicitly prohibits imposing more than one five-year prison term for offenses committed

**{¶ 43}** Ultimately, we concluded as follows in *Howard*:

Because Howard was found guilty of firearm specifications under both R.C. 2941.145 and 2941.146 for the same murder offense, the trial court was required to impose both a three-year and a five-year prison term for the two specifications to that offense. Further, R.C. 2929.14(B)(1)(g) required the court to impose at least one additional three-year term, in order to punish Howard for "each of the two most serious [R.C. 2941.145] specifications of which" he was found guilty – i.e., to sentence Howard on one three-year specification in relation to each of the murder and felonious assault offenses as to which the trial court entered a judgment of conviction. The trial court erred as a matter of law by merging the three-year firearm specification to Howard's conviction for felonious assault on Coleman with the three-year firearm specification to his conviction for Hall's murder, and thereby failing to impose a second three-year sentence on the three-year firearm specifications to Howard's crimes.

*Id.* at ¶ 97.

**{¶ 44}** The same analysis applies in Davison's case, which presents the same scenario. Although the trial court correctly imposed three-year and five-year prison terms on Davison's firearm specifications under R.C. 2941.145 and R.C. 2941.146, it was obligated by R.C. 2929.14(B)(1)(g) to sentence Davison on a three-year firearm specification for the aggravated murder of Darion Harris *and* on a second three-year firearm specification for the murder of Ashley James. The State's second assignment of

---

as part of the same act or transaction.

error is sustained.

{¶ 45} Based on the reasoning set forth above, we reverse the trial court's judgment insofar as it merged Davison's discharging a firearm on or near a prohibited premises offense into the aggravated murder offense. The doctrine of merger did not apply because the two offenses were of dissimilar import or significance. We also reverse the trial court's judgment insofar as it merged each of Davison's three-year firearm specifications into one. The matter is remanded for a limited resentencing to correct these errors. In all other respects, the trial court's judgment is affirmed.

. . . . . . . . . . . . .


TUCKER, P.J. and DONOVAN, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Charles W. Slicer, III
Hon. Mary L. Wiseman